```
                 IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ALABAMA
                           SOUTHERN DIVISION
```

LORETTA P. WILLIAMS,           }
                               }
     Plaintiff,                }
                               }   CIVIL ACTION NO.
v.                             }
                               }   99-AR-3415-S
UNIVERSITY OF ALABAMA HEALTH   }
SERVICES FOUNDATION, P.C.,     }
                               }
     Defendant.                }

### MEMORANDUM OPINION

Presently before the court is a motion for summary judgment by defendant, University of Alabama Health Services Foundation, P.C. ("UAHSF"). Plaintiff, Loretta P. Williams ("Williams"), alleges that UAHSF violated Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981 (1) by discriminating against her on the basis of her race (black) in discipline, termination, wages and transfers, and (2) by terminating her after she complained of racial discrimination. UAHSF says that Williams' substandard work performance was the reason for disciplining and ultimately terminating Williams. For the reasons set out more fully below, UAHSF's motion will be granted.

### Pertinent and Undisputed Facts, and Some Disputed Facts

In February 1998, Kirklin Clinic, a subsidiary of UAHSF, hired Williams as its front desk receptionist. In February 1999,



Karen Hammond ("Hammond"), Unit Manager for the Reproductive Biology Endocrinology Division of the Department of Obstetrics and Gynecology (the "Endo Division"), asked Williams if she was interested in being promoted to Medical Records Clerk in the Endo Division. After thinking over the opportunity, Williams applied for and obtained the job, beginning her work in the Endo Division on March 1, 1999. Williams, like all UAHSF employees, was to serve a six-month probationary period in her new position.

As a medical records clerk, Williams was responsible for performing the following duties: (1) retrieving and collecting patient charts for doctors to use in clinics; (2) filing materials in patient charts; (3) collecting and gathering materials from doctors' and nurses' offices to be filed in charts; (4) responding to requests for medical records; (5) creating charts for new patients; and (6) answering the telephone, taking telephone messages, faxing documents, and other administrative duties as assigned.

In March 1999, Hammond and Cindi Rickard ("Rickard"), the Clerical Supervisor, met with Williams to discuss her job performance. According to Hammond, Williams was "unable to keep up with the filing and locating patient charts." Hammond Aff., ¶5. Hammond asked Williams if she felt overwhelmed by the position and whether Williams wanted to transfer to a switchboard position

within the Endo Division. Williams said she did not feel overwhelmed and declined the proffered transfer, but agreed to have other employees assist her until she was caught-up with her filing duties.

On April 7, 1999, Hammond and Rickard again met with Williams because her job performance had not improved, and issued her a written warning that specified, among other things:

> [Y]our inability to perform your job responsibilities at a satisfactory level is impacting your co-workers and disrupting patient care. This memorandum will serve as notification that you are expected to perform your job responsibilities at a satisfactory level in order to prevent further progressive discipline for substandard performance.

On April 9, 1999, Hammond, Rickard, and two other staff members met with Williams for a third time to discuss problems with Williams' job performance. The participants reached a consensus on Williams' daily job priorities, and Williams agreed to have Steve Rayborn ("Rayborn"), a medical records clerk in the Medical/Surgical Division, assist her with loose leaf filing. While Hammond believed the meeting was productive, Williams felt she was unfairly criticized and "double-teamed" by the other members of the Medical Records Department. In her deposition, Williams testified, however, that she did not believe the criticism was racially motivated:

3

> Q: And you thought that they were not being fair to you in their assessment of your job?
>
> A: No. They was not fair to me.
>
> Q: During that meeting, did anybody make any comments of a racial nature?
>
> A: Not of a racial nature. But . . . as I mentioned, if it was four people in this department, which was three whites and one black, why was I the only one in that meeting?

Williams Depo., at 213.

In May 1999, UAHSF's concerns about Williams' job performance persisted. Hammond received complaints from Dr. Michael Steinkampf ("Steinkampf"), the Endo Division Director, Dr. Richard Blackwell ("Blackwell"), a doctor in the Endo Division, and Susan Thompson ("Thompson") and Charla Childers ("Childers"), nurses in the Endo Division. In an electronic mail message to Hammond, Steinkampf expressed the belief that "patient care [was] being compromised" by Williams' apparent inability, among other things, "to file and retrieve lab slips". Steinkampf told Hammond to terminate Williams and "have the position refilled by someone more competent." On June 16, 1999, as a result of these complaints, Hammond and Rickard again met with Williams to discuss her job performance and to issue her a second written warning, which stated, among other things, that "[t]his will serve as your final warning that your performance

with regard to the medical records function must immediately improve to a satisfactory level in order to prevent further disciplinary action, up to and including termination of employment."

On June 17, 1999, Williams filed a complaint with Jeannie Thomas ("Thomas"), Employee Relations Manager. On the grievance form, Williams stated that she had "been treated very unfair [sic] since excepting [sic] this position" and that "the work piles up and I'm threatened to be terminated if I don't catch up." Williams complained that her job was too much for one person. Williams admitted in her deposition that in her grievance form she "didn't mention anything about race discrimination." During her deposition, however, Williams stated that she told Thomas during their meeting that she believed she was suffering race discrimination. According to Thomas, Williams' grievance "was not grievable . . . [because] Williams never mentioned to me that she felt she was being discriminated against because of her race." Thomas Aff., ¶5.

On July 16, 1999, Hammond received another complaint from Blackwell concerning Williams' job performance. Blackwell stated, among other things, that "[w]e continue to experience numerous problems with our medical records . . . and I really think it is time to make a change in medical records personnel. The current

5

situation puts the clinic at considerable legal risk, and quite frankly, if it were not for my shadow chart system we would have great difficulty operating this practice." On July 30, 1999, due to Blackwell's complaint and other problems, UAHSF issued Williams a second final written warning and suspended her without pay for three days. The notice served as Williams' final warning regarding job performance, and stated that "[c]ontinued inability to perform at a satisfactory level or any future complaints will result in the termination of your employment." Williams refused to sign the warning.

On or about August 2, 1999, Williams filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). She complained that UAHSF had discriminated against her because of her race by disciplining her, while not disciplining white employees for similar performance problems.

On August 5, 1999, Williams returned to work after her suspension. On August 16, 1999, UAHSF terminated her based, according to it, on her alleged overall substandard performance, her history of counseling, and specifically as a result of certain events, the facts of which are disputed by the parties, that transpired on August 12 and 13, 1999.

On September 1, 1999, the EEOC sent Williams a letter concerning her charge of employment discrimination. The letter

6

stated that Williams "had not submitted any evidence that other [employees at UAHSF] are not subjected to the same [progressive] discipline policy or that others who had performance problems were not treated differently than yourself." Unless Williams submitted additional evidence to buttress her allegations, the EEOC would dismiss the charge. On September 9, 1999, Williams sent a letter to the EEOC which provided additional details about her original charge. Absent from Williams' original complaint and subsequent letter is any mention of alleged discrimination in connection with her wages, transfer requests, or termination.

On September 30, 1999, finding no reasonable basis for Williams' claims, the EEOC issued her a right-to-sue letter. On December 28, 1999, Williams filed her complaint in this action. As of January 2001, the current Endocrinology Medical Records Clerk position was held by a black woman, and the two individuals who held the position before Williams were both black. Hammond Aff., ¶11.

### Summary Judgment Standard

Rule 56(c), F.R.Civ.P. provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The

7

Supreme Court has emphasized that this language means exactly what it says: there must be a **genuine** issue of **material** fact, not merely some factual dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510 (1986). What this standard means in practice is that "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511 (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575 (1968)).

Defendant's motion for summary judgment should be denied "if there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997)(quoting *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989)). If, however, as a matter of law, a jury could not return a verdict for plaintiff, defendant's motion must be granted.

### Discussion

#### 1. Standing under 42 U.S.C. § 1981

Williams asserts claims pursuant to both Title VII and 42 U.S.C. § 1981. UAHSF contends that Williams lacks standing under § 1981 because she was an at-will employee, and that the lack of an employment contract precludes § 1981 liability.

8

Section 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts...as is enjoyed by white citizens...." 42 U.S.C. § 1981(a). The statute's goal is to remove the barriers of discrimination from a minority's ability to participate fully and equally in the marketplace. *See Brown v. American Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991).

Some courts which have considered this issue hold that an individual must have an actual employment contract in order to have standing under § 1981. *See Jones v. Becker Group of O'Fallon Div.*, 38 F. Supp. 2d 793 (E.D. Mo. 1999) (holding that an at-will employee cannot maintain a cause of action under 42 U.S.C. § 1981, since, under Missouri law, unless there is a contract that provides for the terms and conditions of employment, the employee is considered an "at-will" employee and may be discharged from employment without cause or reason); *see also Gonzalez v. Ingersoll Mill Mach. Co.*, 133 F.3d 1025, 1033-1035 (7th Cir. 1998); *Moscowitz v. Brown*, 850 F. Supp. 1185, 1192 (S.D.N.Y. 1994). To date, the Eleventh Circuit has not squarely addressed this issue. Despite the divergent views among the circuits, district courts within the Eleventh Circuit hold that an at-will employee can bring a racial discrimination action under 42 U.S.C. § 1981 on the basis that the

9

contractual nature of at-will employment falls within the definition of "contract" in § 1981.[1] This court believes the courts within the Eleventh Circuit follow the better view when they say:

> [E]ven at-will employees have some sort of contract, in the broader legal sense of that term, with their employer. Even though the at-will employee could not file a breach of contract claim for being fired (since he has no protections), the at-will employee would be able to file a breach of contract claim if, for example, he was not paid the correct amount. "Contract" is used in § 1981 in its basic legal meaning, not a specialized labor law meaning.

*Lane v. Ogden Entertainment, Inc.*, 13 F. Supp. 2d 1261, 1272 (M.D. Ala. 1998). The court finds this reasoning persuasive. Because employees often work for employers without any written contract, the on-going exchange of labor and pay represents a "contract". Moreover, public policy supports interpreting § 1981 to protect at-will employees for to find otherwise "would effectively eviscerate the very protection that Congress expressly intended to install for minority employees" under Title VII. *Fadeyi v. Planned Parenthood Assoc. of Lubbock, Inc.*, 160 F.3d 1048, 1050 (5th Cir. 1998).

---

[1] *See, e.g., Lane v. Ogden Entertainment, Inc.*, 13 F. Supp. 2d 1261 (M.D. Ala. 1998); *Farrior v. H.J. Russell & Co.*, 45 F. Supp. 2d 1358 (N.D. Ga. 1999); *Knight v. Palm City Millwork and Supply Co.*, 78 F. Supp. 2d 1345 (S.D. Fla. 1999); *Faulk v. Home Oil Co., Inc.*, 184 F.R.D. 645 (M.D. Ala. 1999); *Copley v. Bax Global, Inc.*, 80 F. Supp. 2d 1342 (S.D. Fla. 2000); *Moghadam v. Morris*, 87 F. Supp. 2d 1255, 2000 WL 286688 (N.D. Fla. 2000).

Williams, therefore, has standing to bring her § 1981 claim.

## 2. Scope of EEOC Complaint

As mentioned above, Williams claims that UAHSF discriminated against her because of her race in wages, transfers, discipline and termination. UAHSF claims that Williams cannot pursue a claim for disparate treatment in wages, transfers or termination because her charge of race discrimination filed with the EEOC did not make those complaints. The court finds UAHSF's argument on this point persuasive.

No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge. *See generally* 42 U.S.C. § 2000e-5. This court held a number of years ago in *Wallace v. Alabama By-Products Corp.*, 1985 WL 6142 (N.D. Ala. Sep. 25, 1985), that the old Fifth Circuit would allow a Title VII plaintiff to pursue a court action only on those charges which are "like or related" to the allegations in his or her EEOC charge:

> the allegations in a judicial complaint filed pursuant to Title VII 'may encompass any kind of discrimination like or related to allegations contained in the charge and growing out of such allegation during the pendency of the case before the Commission.' [citations omitted]. In other words, the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.

11

*Wallace*, 1985 WL 6142, at *2 (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970)).[2] This court further stated:

> It is only logical to limit the permissible scope of the civil action to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination . . . A *less* exacting rule would also circumvent the statutory scheme, since Title VII clearly contemplates that no issue will be the subject of a civil action until the EEOC has first had the opportunity to attempt to obtain voluntary compliance.

*Id.* (citing *Sanchez*, 431 F.2d at 466-67 (emphasis in original)). It is well settled in the Eleventh Circuit that a plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. *See Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000); *Mulhall v. Advance Security*, Inc., 19 F.3d 586, 589 n.8 (11th Cir. 1994); *Herbert v. Monsanto Co.*, 682 F.2d 1111, 1115 (5th Cir. 1982).

The purpose of requiring an EEOC complaint before the filing of suit is to encourage and promote an amicable resolution of the controversy between employer and employee. To allow Williams to bring a discrimination claim now concerning wages and transfers,

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

12

without ever having involved the EEOC on such easily presented issues, violates the whole concept of dispute resolution Congressionally mandated by Title VII. Even though courts should "construe an EEOC charge with the utmost liberality", *Terrell v. United States Pipe & Foundry Co.*, 644 F.2d 1112, 1123 (5th Cir. 1981), the court cannot countenance a controversy that the EEOC had no realistic chance to explore. *See Wallace*, 1985 WL 6142, at *2. The EEOC investigation pursued matters concerning race discrimination in discipline and suspension. Because Williams' EEOC complaint and subsequent letter are completely devoid of any claim of discrimination in her salary or her inability to transfer, the EEOC did not pursue an investigation into those allegations. Therefore, even viewing the EEOC charge with the "utmost liberality", the Title VII charge of discrimination in wages and transfers is beyond the scope of Williams' EEOC complaint, and will not be considered in this action. While Williams' letter to the EEOC failed to mention her termination or possible discriminatory retaliation claim, the court concludes that because a claim of wrongful termination and retaliation could reasonably be expected to grow out of an original charge of race discrimination, the court has jurisdiction to hear those claims.

### 3. Claims of Race Discrimination in Discipline and Termination

Williams contends that non-minority co-workers committed nearly identical offenses as she did but that UAHSF failed to discipline them. Specifically, Williams asserts that while Rayborn, a white, was disciplined on three occasions over a sixteen-month period for work-related deficiencies, (e.g. "playing on the internet, performing magic tricks, and talking on the phone") he was not terminated. UAHSF counters with the assertion that no other employee had performance problems of the same magnitude as Williams.

Under the *McDonnell Douglas* framework, Williams can establish a *prima facie* case of discrimination by showing: (1) she belongs to a protected group; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside the protected class more favorably; and (4) she was qualified to do the job. See *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). Once a plaintiff establishes all the elements of his or her *prima facie* case, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action. *E.E.O.C. v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993). If the employer offers legitimate reasons for the employment action, the plaintiff must demonstrate that the employer's proffered explanation is a pretext for

14

discrimination. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973). The parties do not dispute that Williams is black, she was fired, and she was "qualified" for her job (or UAHSF wouldn't have offered her the promotion in the first place). They do disagree, however, as to whether Williams was treated less favorably than similarly situated, non-minority employees.

The court finds that Williams has failed to produce sufficient evidence to establish that Rayborn's conduct was of comparable seriousness as the conduct for which Williams was discharged. While UAHSF found Rayborn's conduct unacceptable and inappropriate (and UAHSF disciplined him accordingly), his behavior did not compare to Williams' shortcomings. The number of complaints, both orally and written, filed against Williams over a five-month period, far outweighs the three complaints filed against Rayborn over a sixteen-month period. Unlike Rayborn's performance, Williams' performance was apparently so deficient that doctors and nurses believed Williams was exposing UAHSF to possible legal action by its patients. Having failed to meet her burden of proving she was similarly situated to a more favorably treated employee, Williams has not established a *prima facie* case.

Assuming *arguendo* that Williams had established her *prima facie* case, she has failed to produce any evidence that UAHSF's proffered reasons for disciplining and eventually terminating her were based

15

on racial animus. As the Eleventh Circuit has pointed out, Williams must "present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice." *Earley v. Champion International Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). Williams has not met this burden.

Williams has not pointed to specific facts which cast doubt on the truth of UAHSF's legitimate, nondiscriminatory reasons. Williams' brief and supplemental brief in opposition to UAHSF's motion for summary judgment offer no evidence to rebut UAHSF's proffered legitimate, nondiscriminatory reasons. Williams seems to suggest evidence of race discrimination merely because Rayborn temporarily replaced Williams as the medical records clerk in the Endo Division after she was terminated. The court fails to see how this fact alone is evidence of pretext, and how discriminatory intent can be fairly deduced from the fact, assuming it to be a fact, that the UAHSF employed its ability to make the subjective judgment that employers have to make from time to time. Under the law, Hammond is permitted to make hiring and firing decisions of persons under her authority, and she may legally terminate Williams' employment.[3] All that Hammond may not do, for purposes

---

[3] The court believes that the fact that Hammond was responsible for both hiring and firing Williams gives rise to a "permissible inference" that no discriminatory animus motivated UAHSF's actions. *See Williams*

16

of this dispute, is to fire Williams on account of her race. In any event, Williams has failed to provide evidence that Hammond's articulated nondiscriminatory reason for terminating her is pretext. The court's "role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second-guesses employers' business judgments." *Alexander v. Fulton County*, 207 F.3d 1303, 1340 (11th Cir. 2000)(citing *Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1329-30 (10th Cir. 1999)). For this reason, Williams' claim ultimately fails as a matter of law.

### 4. The Retaliation Claim

Williams claims that UAHSF terminated her in retaliation for the filing of an EEOC charge of race discrimination on August 2, 1999. Williams' sole basis for this claim is that the "temporal proximity of the filing of the EEOC charge and the circumstances surrounding [her] termination suggests that [her] termination was the result of retaliation." Curiously, Williams raised her retaliation claim not in an amended EEOC complaint or in her letter

---

*v. Vitro Servs. Corp.*, 144 F.3d 1438, 1443 (11th Cir. 1998) (emphasizing that evidence that "same actor" both hired and fired plaintiff raises a permissible—not a mandatory—inference); *see also Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996) (holding that "[w]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff . . . a strong inference arises that there was no discriminatory motive."); *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996) (acknowledging with approval that "same actor" inference has been accepted by several other circuit courts).

17

in support of her EEOC complaint, but rather cryptically in her complaint filed in this action.

In order to establish a *prima facie* case of retaliation, Williams must show that: (1) she engaged in protected activity; (2) that UAHSF was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal link between the protected activity and the adverse action. *See Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999); *Taylor v. Runyon*, 175 F.3d 861, 868 (11th Cir. 1999); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

Once a plaintiff establishes all the elements of his or her *prima facie* case, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action. *E.E.O.C. v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993). If the employer offers legitimate reasons for the employment action, the plaintiff must demonstrate that the employer's proffered explanation is a pretext for retaliation. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

Again, assuming *arguendo* that Williams has established her *prima facie* case of retaliation (an assumption this court rejects), the court finds that temporal proximity, alone, is insufficient evidence to support Williams' argument that UAHSF retaliated against her. As discussed more fully above, Williams offers no

18

evidence to rebut UAHSF's proffered legitimate, nondiscriminatory reasons for its decision to terminate her employment. While Williams could make out a jury case of causation with circumstantial evidence that UAHSF's retaliatory conduct occurred within close "temporal proximity" to the EEOC charge, UAHSF's extensive documentation concerning Williams' performance problems and complaints coupled with the course of her progressive discipline over a five-month period, commenced long before Williams engaged in any protected expression. This case is, thus, distinguishable from *Gary Story v. VAE Nortrak, Inc.*, CV 97-AR-3355-S, with which counsel for Williams is familiar.

## Conclusion

A separate and appropriate order in conformity with the foregoing opinion will be entered.

DONE this __19th__ day of March, 2001.

                                                                  _/s/ William M. Acker_
                                                                  WILLIAM M. ACKER, JR.
                                                                  UNITED STATES DISTRICT JUDGE